MAUD S. BRYANT v. THE OMAHA AND COUNCIL BLUFFS RAILWAY AND BRIDGE COMPANY, Appellant.

**Damages: NEGLIGENCE.** A verdict for four thousand dollars in favor of a single woman, twenty-one years old, earning about seventy-five dollars a month as a stenographer, for a personal injury, was not excessive, where it appears that plaintiff was confined in bed for five weeks, during which time she had difficulty in breathing, and suffered intense pain in her leg from inflammation of the bone; that such pain continued up to the time of the trial, a period of seventeen months, and was likely to be permanent; that plaintiff walked with a limp, and still suffered pain in her chest when she leaned forward; that she had been able to do no regular work since the injury, and had paid some two hundred dollars for medical treatment and nursing.

**PROSPECTIVE DAMAGES:** *Evidence.* In an action for personal injuries which prevented plaintiff from performing her work as a stenographer, it was proper to show, as bearing on the question of damages, that under her contract of employment she was to receive an increase of salary in a short time, if her work proved satisfactory.

*Appeal from Pottawattamie District Court.*—HON. N. W. MACY, Judge.

SATURDAY, MAY 23, 1896.

ACTION to recover damages for a personal injury sustained by the plaintiff while traveling as a passenger on the defendant's railroad. There was a trial by jury, and a verdict and judgment for the plaintiff. Defendant appeals.—*Affirmed.*

*Wright & Baldwin* for appellant.

*Flickinger Bros.* for appellee.

ROTHROCK, C. J.—It appears from the evidence in the case, that on the thirty-first day of May, 1893, the

plaintiff was severely injured while riding on the defendant's electric motor line, by reason of a collision of the car in which she was riding, with a train, at a crossing on another railroad. The collision and the injury to the plaintiff were described as follows, in her examination as a witness, on the trial: "Live at Council Bluffs, Iowa. On May 31, 1893, the members of our family were, father, mother, brother, and younger sister. At that time I was stenographer for the Rock Island Railway, at the freight depot, and was getting fifty dollars a month; and in addition, I was doing job work, writing articles and notes for different parties, and making from twenty to twenty-five dollars a month besides. Had been working for the Rock Island about three months. The usual way for me to go to my office was by the defendant's electric motor. I went on the line four times a day. On the afternoon of the thirty-first of May, 1893, when this accident occurred, I got on the car at the Methodist Church, and nothing of note happened until we got to the Chicago, Burlington & Quincy Railroad tracks on Main street. When we arrived there I was sitting with my arm on the window sill, and looking at the back door of the car. In crossing over the tracks the freight cars were backing, and they struck the car about the center, and threw Mr. Holmes and Mr. Bixby across the aisle. I think they came to the other side of the car, and they were in some manner thrown out. There was a portion of the car that I was sitting in left or remaining, and with the crash came a piece across my chest, and pinioned my arms so that I could neither move my shoulders nor my arms. It was so heavy it felt as if it would crush my breath right out of me. Subsequently there was a piece of timber caught both of my limbs, from below the knees down, and I could not move hand or foot. The seat I was sitting on gave way, and there was a second jar that

loosened my arms and the timber in front of me in such a manner that I had partially loosened one arm, —the left one,—and then I was thrown out through the glass and broken timbers onto the stone pavement, with my face toward the wreck. I attempted to get up, and saw my face and hands were bloody, and I couldn't breathe, and the pain was intense and severe. Tried to use my limbs. Could not stand, and was falling when some one caught me. I was carried into Bradley's, and that is all I remember. The blood that was on me was that of others. I think it came from Mr. Holmes, who was killed. I do not remember anything after I was taken into Bradley's until I got home and was in bed. I could not breathe then. The pain in my limb was intense. The left limb received a puncture,—a hole. I was confined to my bed five or six weeks. Dr. Macrae was my physician. This trouble and difficulty in breathing continued for five weeks. It was six weeks before I could sit up in a chair. When I first tried to walk I had the assistance of two members of my family. The pain in my left limb continues up to this day. It has lamed me. I limp when I walk. Cannot use it the same as the other now. There is pain, continual pain,—more in damp weather,—and it interferes with my work. I cannot work. The pain is constant. I have pain in my chest, on leaning forward or raising my arms to my head. When I sit up it does not pain me. Have only been able to wear a corset since, for short periods. Changes in the weather affect my limb. Used a crutch or cane two months. Tried to go to work about the middle of September, 1893. The condition of our financial affairs—my mother being sick—was such that I was compelled to. I worked until the first of November. Had to quit then on account of suffering. I went to Macrae each noon for treatment for my limb. I have not performed any regular work since. I was compelled to hire a

nurse to wait on me for six or eight weeks, and paid her $12 a month. Bill for medicine has been from $50 to $55. I do not know what my physician's bill is. Dr. Macrae has attended me on an average once a week in the last six months. During my first illness he called three times a day, later twice, and lastly once; and of late I have gone to his office, or got prescriptions from him, for liniments for my limb, and applied it myself. I am using liniments on my limb at the present time. This pain in my limb is continual and intense all the time. It has been so I cannot keep my weight on it. When it is pleasant and sunshiny I can get around better than when it is damp. I never was sick prior to this accident, or had any injury of any kind. The effect upon my nervous system is bad,—keeps me nervous." The foregoing is the examination in chief of the plaintiff, as shown by appellant's abstract. We have set it out in full, because liability for the injury is admitted by the defendant. It was stipulated by the parties at the time of the trial in the district court, that the defendant was liable for the injury, "and that the only questions for litigation and determination are as to the extent of the plaintiff's injuries, and the amount of her recovery, and all other questions are waived."

The verdict and judgment were for four thousand dollars, and the main question in the case is whether the judgment should be reversed because it is excessive, and without support in the evidence to sustain the amount of the recovery. If the testimony of the plaintiff, as above set out, was impeached and shown to be untrue by undisputed facts,—or, in other words, if the evidence against her was such as to stamp her testimony as false, in so unmistakable a manner that the jury were not warranted in believing her,—then this verdict was excessive. But there is really no conflict in the evidence as to the severity of

the injury. The plaintiff is corroborated by several members of her family and others, who testified to the extent of her nervous shock from the injury, the medical attention and nursing necessary, and the time she was confined to her bed and to her home. She was a single woman, about twenty-one years old, at the time of the accident. As has been stated, the injury was received on the thirty-first day of May, 1893. The trial was had in the district court in the last days of October, 1894, being a year and five months after the injury. The claim was made by plaintiff in the petition, and on the trial, that the injury was permanent, and it is insisted in argument in this court by counsel for defendant that there was no evidence authorizing the jury to find that the injury was more than merely temporary. In other words, it is urged that the claim of the plaintiff that she still suffered from the injury was a mere pretense, without foundation, and feigned for the purpose of aggravating the damages. Medical testimony was introduced by both the plaintiff and the defendant on this question. The medical witnesses for the plaintiff testified, that the plaintiff was then suffering in her left leg. The nature of the injury to the leg is described by the physician who attended the plaintiff from the time the accident occurred, as follows: "The surgical name for this injury is, 'ostitis,'—inflammation of the bone or bone substance. This covers the inflammatory condition of the whole bone, including the bone marrow and the bone itself. The covering of the bone is called the 'periosteum.' She had a good deal of inflammation under the periosteum. I have examined this leg lately, and right along. The external appearance is some roughening of the periosteum. By that I mean, when the fingers are run along the flat surface of the bone you can detect little raised points, and then further down there is a larger thickening. I

do not know if it is inside or outside of the periosteum. Anyhow, it is hard and calloused. It is about four inches below the original injury. This injury to the left leg, or the tibia of the left leg, is permanent. The effect of this condition on the patient will be pain—constant pain. Ostitis can exist without any external appearances. If the pain did not go off in five or six months, I should think that it was chronic. She has always walked lame since the injury. I told her to get around as well as she could; she should enjoy herself and take buggy rides,—get her mind off herself. My charge for professional services is about $100." Some three other physicians testified to facts corroborating the testimony we have above set out. About an equal number of medical experts testified that there was no evidence of ostitis, or inflammation of the bone substance. We will not set out the reasons given for the opinions of the physicians on the subject. Their conclusions and opinions are in hopeless conflict, and it was for the jury to determine the extent of the injury from all the evidence in the case. There is evidence in the record tending strongly to show that the plaintiff's actions before the trial did not indicate that she was lame, or that she suffered from any infirmity or defect in her leg. This is contradicted by other evidence in behalf of the plaintiff. The plaintiff was before the court and the jury, and they considered this evidence, and in connection with her appearance as to her health, her demeanor on the witness stand, and the manner in which she conducted herself in giving her testimony, and it is not the province of this court to take the place of this jury and settle the conflict, nor to overrule the district court in its finding that a motion for a new trial should not be allowed.

II.    In the course of the examination of the plaintiff as a witness, she was asked: "What was your

contract with the Rock Island Company at the time you went to work for them, as to salary? A. If I remained, and proved satisfactory, I was to receive some raise in salary. Q. How soon was you to receive this advance? A. Within a short time. There was no specified time." These questions were objected to. The objections were overruled, and defendant excepted. It is said that the admission of this evidence was error. The case of *Brown v. Railway Co.*, 64 Iowa, 652 (21 N. W. Rep. 193), is relied upon as sustaining the proposition of counsel. In that case a fireman on an engine was injured, and the plaintiff was permitted to prove that competent firemen were sometimes employed as engineers, at an increased compensation. It was held that this was error, because the estimate of damages should be made with reference to such facts as actually existed, and such as it is reasonably certain would have occurred in the future. In the case at bar the proof was that by the contract of employment the compensation was to be increased within a short time if plaintiff remained in the service and her work was satisfactory. It depended on no such a remote and uncertain contingency as was considered in the cited case.

Other questions are made which we do not think demand special mention. An examination of the record satisfies us that there was no reversible error, and the judgment of the district court is AFFIRMED.